# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

JOHN T. FRUGE; CALVIN
MCCORVEY; JOSEPH A. SAM; JAMES
A. GUIDRY, JR.; ROGERS BEN; MARK
BROUSSARD; GILBERTO S.
CARRERA; WILLIE CEASER, JR.;
THOMAS P. CESSAC; JOSEPH DAVIS;
FERNANDO GUZMAN; DAMIAN
GUZMAN; DAVID HOBBS; ELIJAH
HOLMES; TRAVIS HUDSON;
LINWOOD LOUPS; JOSEPH K.
MEAUX; CURTIS MOUTON; ADRIAN
G. RAMIREZ; GREGORIO TREJO;
MICHAEL WILLIAMS; EDWARD
NGUYEN; KENT WRIGHT; CURTIS L.
ALEXANDRIA; MARTY BUSH; EDWIN
CAMARA; ARTHUR PREJEAN;
RONNIE HARTZOG; KELDRICK
BESSARD; GEORGE W. PETRY, JR.;
HERBERT FISHER; RUBEN DOXEY;
BARRETT DOXEY; WILLIAM L.
DOXEY; LAWRENCE LEGER; ROBERT
SCOTT; MARK ACHESON; SEAN
BARTIE; RAYMOND GREGORY;
DOUGLAS R. RANDALL; LEROY
SAVOY; NATHANIEL BENFIELD;
GODWIN B. HENDERSON; LARRY T.
BOUDOIN; PHILLIP N.
WHITTINGTON; JOHN NEWMAN;
JASON BROWN; SAMUEL NOEL;
BERNARD THORNTON, JR.; KAREEM
CAMPBELL; DEREK HOLTON;
NATHAN R. DAVIS; ANDERSON J.
WILLIAMS, JR.; JEFFREY BENOIT;
SAM GUIDRY; EDWARD CHRETIEN;
STEVE W. SHELTON; GERALD J.
DRUILHET; ROBERT DOBY; DAVID
W. SMITH, JR.; MARLON GRUILHET;
MELVIN COCKRELL,

                    Plaintiffs,

    vs.

BP, PLC; BP EXPLORATION &
PRODUCTION, INC.; BP PRODUCTS
NORTH AMERICA, INC.; BP
AMERICA, INC.; BP CORPORATION
NORTH AMERICA, INC.; BP
COMPANY NORTH AMERICA, INC.;
TRANSOCEAN, LTD.; TRANSOCEAN
OFFSHORE DEEPWATER DRILLING,
INC.; TRANSOCEAN DEEPWATER,
INC.; HALLIBURTON ENERGY
SERVICES, INC.; MITSUI OIL
EXPLORATION CO. LTD; MOEX
OFFSHORE 2007, LLC; ANADARKO
PETROLEUM CORP.; CAMERON
INTERNATIONAL CORPORATION,
f/k/a COOPER CAMERON
CORPORATION; AND M-1, LLC, a/k/a
SWACO, SCHLUMBERGER LTD.;
WEATHERFORD INTERNATIONAL
LTD. and HYUNDAI HEAVY
INDUSTRIES CO. LTD., INC.,

Defendants.

## COMPLAINT

Plaintiffs, by and through undersigned counsel, bring this action against the
defendants identified below, and aver as follows:

### INTRODUCTION

1.     Plaintiffs are individuals who rely on the natural resources found in the
Gulf of Mexico for their livelihood.  They bring this action against defendants for losses
and damages arising out of the catastrophic and avoidable oil spill off the Gulf Coast
caused by the April 20, 2010 explosions and fire aboard the *MODU Deepwater Horizon*
oil rig ("*Deepwater Horizon*"), and the subsequent sinking of that rig and discharge of oil
into the surrounding water.

2

2.      The *Deepwater Horizon* was an oil rig located about 40 miles southeast of the Louisiana coast in the Macondo Prospect oil field in the Gulf of Mexico.  On April 20, 2010, it exploded and caught fire.  The rig burned for two days before tipping into the sea, on its way bending and breaking a long riser pipe carrying oil to the surface from the seafloor.  As the *Deepwater Horizon* sank, it broke off the riser, leaving the pipe leaking oil out of its now-opened end as well as through two breaks along its length.

3.      Although the investigation is ongoing, the immediate cause of the explosions on the rig appears to have been the ascendance of a bulge of methane gas through the riser.  The methane gas erupted as it reached the surface of the rig.

4.      On information and belief, several events leading up to the explosion could have caused or exacerbated the release of methane gas, including faulty materials and/or procedures used in the cementing process for the well, removal of drilling mud from the riser, leaks from or other defects relating to the blowout preventer valve ("BOP") at the wellhead and improper well depth.

5.      To make matters worse, the BOP, installed at the wellhead for just such a disaster, failed to seal the wellhead as it should have, leaving the well spewing oil into the Gulf waters.

6.      To date, as a result of the catastrophic explosions, fires and sinking of the *Deepwater Horizon*, crude oil has been leaking from the wellhead and broken riser drilled by the rig at a rate estimated between 35,000 and 60,000 barrels (1,470,000 to 2,520,000 gallons) of oil per day, spreading into a widening slick of oil on and below the Gulf's surface. This estimate is based on information prior to BP's cutting of the riser above the

BOP on June 3, 2010. The government believes the amount of barrels leaking from the well could be significantly higher since the riser has been cut.

7.      The growing, fast-moving slick is large enough to be visible from outer space and spreading with the wind and currents towards the Louisiana, Mississippi, Alabama, Florida and Texas coastlines.  To date, millions of gallons of oil have spilled into the Gulf and the oil has reached the southeast Louisiana coast. In fact, the U.S. government has determined that the Gulf of Mexico oil spill caused by the sinking of the *Deepwater Horizon* is now the worst oil spill in U.S. history, and may be the worst environmental disaster ever experienced in our nation's history.

8.      The spilled oil has already caused damage to the Gulf of Mexico's marine, coastal and estuarine environments, which are used by plaintiffs, who are commercial fishermen, to earn their livelihoods.  In fact, on May 19, 2010, heavy, black oil hit Louisiana wetlands and oil continues to impact the coast and coastal waters. With the wellhead unabatedly spewing hundreds of thousands of gallons of oil per day into the waters near Louisiana, plaintiffs are suffering and will continue to suffer serious economic losses. The U.S. government has closed more than 78,000 square miles of the Gulf to commercial fishing, which has led to increased fishing in the waters that remain open. The Coast Guard continues to close more areas of the Gulf as the oil spill spreads, and the waters will likely be closed to the fishermen for months, and potentially years, to come. The fishing season for the plaintiffs, lasting from April to October, is essentially ruined by the pollution and closure of Gulf waters.

## PARTIES

### I.    Plaintiffs

9.      Plaintiffs are citizens of the States of Louisiana, Alabama, Mississippi, Virginia or Ohio and all do business in the Gulf of Mexico south of Louisiana.

10.     Plaintiffs are comprised of fishermen who are crew members of commercial vessels, dockworkers and workers in the Omega Protein Plant in Abbeville, Louisiana.

11.     The following plaintiff is a commercial fisherman who works as a crew member on the vessel, *Mermentau*, that prior to the April 20, 2010, explosions had trolled the Gulf waters fishing for menhadens:  Robert Scott.

12.     The following plaintiffs are commercial fishermen who work as crew members on the vessel, *Rachel Burton*, that prior to the April 20, 2010, explosions had trolled the Gulf waters fishing for menhadens:  Jason Brown and Samuel Noel.

13.     The following plaintiff is a commercial fisherman who works as a crew member on the vessel, *M/V Bull Dog*, that prior to the April 20, 2010, explosions had trolled the Gulf waters fishing for menhadens:  Edwin Camara.

14.     The following plaintiffs are commercial fishermen who work as crew members on the vessel, *Calcaceau Pass*, that prior to the April 20, 2010, explosions had trolled the Gulf waters fishing for menhadens:  Arthur Prejean, Ronnie Hartzog, Keldrick Bessard, George W. Petry, Jr., Nathan R. Davis and Robert Doby.

15.     The following plaintiff is a commercial fisherman who works as a crew member on the vessel, *Timbalier Bay*, that prior to the April 20, 2010, explosions had trolled the Gulf waters fishing for menhadens:  Steve W. Shelton.

16.     The following plaintiff is a commercial fisherman who works as a crew member on the vessel, *Barataria Bay*, that prior to the April 20, 2010, explosions had trolled the Gulf waters fishing for menhadens:  David W. Smith, Jr.

17.     The following plaintiff is a commercial fisherman who works as a crew member on the vessels, *LA 7438 ER* and *LA 0168 HP*, that prior to the April 20, 2010, explosions had trolled the Gulf waters:  Melvin Cockrell.

18.     The following plaintiff is a commercial fisherman who works as a crew member on the vessel, *G. P. Anna*, that prior to the April 20, 2010, explosions had trolled the Gulf waters fishing for menhadens:  Herbert Fisher.

19.     The following plaintiffs are commercial fishermen who work as crew members on the vessel, *LA 2442 AK*, that prior to the April 20, 2010, explosions had trolled the Gulf waters fishing for shrimp:  Ruben Doxey, Barrett Doxey and William L. Doxey.

20.     The following plaintiffs are commercial fishermen who work as crew members on the vessel, *Tiger Point*, that prior to the April 20, 2010, explosions had trolled the Gulf waters fishing for menhadens:  Kareem Campbell and Derek Holton.

21.     The following plaintiff is a commercial fisherman who works as a crew member on the vessel, *Terrebone Bay*, that prior to the April 20, 2010, explosions had trolled the Gulf waters fishing for menhadens:  Bernard Thornton, Jr.

22.     The following plaintiffs are commercial fisherman who work as crew members on the vessel, *Oyster Bayou*, that prior to the April 20, 2010, explosions had trolled the Gulf waters fishing for menhadens:  Mark Acheson, Sean Bartie, Raymond

Gregory, Douglas R. Randall, Leroy Savoy, Nathaniel Benfield, Godwin B. Henderson, Anderson J. Williams, Jr., Edward Chretien and Jeffrey Benoit.

23.     The following plaintiffs are commercial fishermen who work as crew members on the vessel, *Pogy Boat*, that prior to the April 20, 2010, explosions had trolled the Gulf waters fishing for shrimp: Larry T. Boudoin and Phillip N. Whittington.

24.     The following plaintiff is a commercial fisherman who works as a crew member on the vessel, *Quick Six Vessel # LA 8205 BT*, that prior to the April 20, 2010, explosions had trolled the Gulf waters fishing for shrimp: John Newman.

25.     The following plaintiff is a commercial fisherman who works as a crew member on the vessel, *LA 6869 SV*, that prior to the April 20, 2010, explosions had trolled the Gulf waters: John T. Fruge.

26.     The following plaintiffs work as crew members on commercial fishing vessels, that prior to the April 20, 2010, explosions had trolled the Gulf waters: Calvin McCorvey and Lawrence Leger.

27.     The following plaintiffs are dock workers for the Abbeville Dock: Curtis L. Alexandria and Gerald J. Druilhet.

28.     The following plaintiff is a worker in the Omega Protein Plant in Cameron, Louisiana: Marlon Gruilhet.

29.     The following plaintiffs are workers for the Omega Protein Plant in Abbeville, Louisiana: Joseph A. Sam, James A. Guidry, Jr., Rogers Ben, Mark Broussard, Gilberto S. Carrera, Willie Ceaser, Jr., Thomas P. Cessac, Joseph Davis, Fernando Guzman, Damian Guzman, David Hobbs, Elijah Holmes, Travis Hudson,

Linwood Loups, Joseph K. Meaux, Curtis Mouton, Adrian G. Ramirez, Gregorio Trejo, Michael Williams, Edward Nguyen, Kent Wright, Marty Bush and Sam Guidry.

## II.    Defendants

30.    Defendant BP, PLC is a British corporation, organized under the laws of the United Kingdom, does business in the State of Louisiana and this district and is one of the world's largest oil companies.

31.    Defendant BP America, Inc. is a Delaware corporation with its principal place of business in Warrenville, Illinois, does business in the State of Louisiana and this district and is a subsidiary of BP, PLC.

32.    Defendant BP Corporation North America, Inc. (formerly BP Amoco Corporation) is an Indiana corporation with its principal place of business in Houston, Texas, does business in the State of Louisiana and this district and is a subsidiary of BP America, Inc.

33.    Defendant BP Company North America, Inc. is a Delaware corporation with its principal place of business in Warrenville, Illinois, does business in the State of Louisiana and this district and is a subsidiary of BP Corporation North America, Inc.

34.    Defendant BP Products North America, Inc. is a Maryland corporation with its principal place of business in Houston, Texas, does business in the State of Louisiana and this district and is a subsidiary of BP Corporation North America, Inc.

35.    Defendant BP Exploration & Production, Inc. is a Delaware corporation with its principal place of business in Warrenfield, Illinois and does business in the State of Louisiana and this district.

36.    Defendants BP America, Inc., BP Corporation North America, Inc., BP Corporation North America, Inc. and BP Products North America, Inc. are subsidiaries of the global parent corporation, BP, PLC, and are referred to in this Complaint collectively as "BP."

37.    BP holds the lease granted by the United States Minerals and Management Service ("MMS") that allows BP to drill for oil and to perform oil-production-related operations at the Macondo site in the Mississippi Canyon Block 252 section of the outer Continental Shelf in the Gulf of Mexico ("Macondo oil well").   As of April 20, 2010, BP operated the Macondo oil well that is the source of the current oil spill. BP owns a 65% interest in the Macondo oil well.

38.    Defendant Anadarko Petroleum Corp. ("Anadarko") is a Delaware corporation with its principal place of business in The Woodlands, Texas, does business in the State of Louisiana and this district and is an oil and gas exploration and production company that owns a 25% interest in the Macondo oil well.

39.    Mitsui Oil Exploration Co. Ltd. ("Mitsui") is a Japanese corporation, organized under the laws of the Japan, has U.S. offices in Houston, Texas, does business in the State of Louisiana and this district and engages in the exploration and production of oil.  Mitsui, together with defendant MOEX Offshore 2007, LLC, owns a 10% interest in the Macondo oil well.

40.    Defendant MOEX Offshore 2007, LLC ("MOEX") is incorporated in Delaware and has its principal place of business in Houston, Texas.  Defendants Mitsui and MOEX hold a 10% interest in the Macondo oil well.

41.     Defendant Transocean Ltd. is a Swiss corporation doing business in the State of Louisiana and this district and is the world's largest offshore drilling contractor and leading provider of drilling management services worldwide.

42.     Defendant Transocean Deepwater, Inc. is a Delaware corporation with its principal place of business in Houston, Texas, does business in the State of Louisiana and this district and is a subsidiary of Transocean Ltd.

43.     Defendant Transocean Offshore Deepwater Drilling, Inc. is a Delaware corporation with its principal place of business in Houston, Texas, does business in the State of Louisiana and this district, is a subsidiary of Transocean Ltd. and is the world's largest offshore drilling contractor.

44.     Defendants Transocean Deepwater, Inc. and Transocean Offshore Deepwater Drilling, Inc. are wholly owned subsidiaries of the global parent corporation, Transocean Ltd., and are referred to in this Complaint collectively as "Transocean."

45.     Transocean owned, and BP was leasing and operating, the *Deepwater Horizon* as it performed production well completion operations on the Macondo oil well on the outer Continental Shelf off the Gulf Coast, at the site from which the oil spill now originates.

46.     At all relevant times, the *Deepwater Horizon* was owned, manned, possessed, managed, controlled, chartered and/or operated by Transocean and/or BP.

47.     Defendant Halliburton Energy Services, Inc. ("Halliburton") is a Delaware corporation with two headquarters, one in Houston, Texas, and one in Dubai, United Arab Emirates, and does business in the State of Louisiana and this district. Halliburton is one of the world's largest providers of products and services to the energy industry.

Aboard the *Deepwater Horizon*, Halliburton was engaged in the cementing operations of the well and well cap.

48.     Defendant Cameron International Corporation, f/k/a Cooper Cameron Corporation ("Cameron"), is a Delaware corporation with its principal place of business in Houston, Texas, and does business in the State of Louisiana and this district. Cameron is a global provider of pressure control, processing, flow control and compression systems as well as project management and aftermarket services for the oil and gas process industries. Cameron manufactured and/or supplied the *Deepwater Horizon*'s blowout preventer valve ("BOP") that may have failed to activate at or after the time of the explosions.

49.     Defendant M-I, LLC ("M-I") is a Texas corporation with its principal place of business in Houston, Texas. M-1, also known as M-I SWACO, supplies drilling and completion fluids and additives to oil and gas companies, providing pressure control, rig instrumentation and drilling waste management products and services. M-I provided the drilling fluids for the *Deepwater Horizon* at the time of the explosion.

50.     Defendant Schlumberger Ltd. is a Netherlands Antilles corporation with its principal place of business in Houston, Texas, does business within the State of Louisiana and this district and was involved in the testing of the strength of the cement linings and seals in the well drilled by the *Deepwater Horizon*.

51.     Defendant Weatherford International Ltd. is a Swiss corporation with its principal place of business in Houston, Texas, does business within the State of Louisiana and this district and was involved with the casing process for the well drilled by the *Deepwater Horizon*.

11

52.     Defendant Hyundai Heavy Industries Co. Ltd., Inc. is a Swiss corporation with U.S. offices in Orlando, Florida, does business within the State of Louisiana and this district and manufactured the *Deepwater Horizon*.

## JURISDICTION AND VENUE

53.     This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a)(1) based on diversity of citizenship and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

54.     Jurisdiction is also appropriate under 28 U.S.C. § 1331, because the claims asserted by plaintiffs arise under the laws of the United States of America, including the laws of the State of Louisiana which had been declared, pursuant to 43 U.S.C. § 1331(f)(1) and 1333(a)(2), to be the law of the United States for that portion of the outer Continental Shelf from which the oil spill originated.  Title 43 U.S.C. § 1331(1) extends exclusive federal jurisdiction to the outer Continental Shelf.

55.     Venue is proper in this district under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims of plaintiffs occurred in this district.

## FACTUAL ALLEGATIONS

### I.     Plaintiffs' Livelihood

56.     Most of the plaintiffs make their livelihood by fishing for Gulf menhadens in the Gulf of Mexico near Louisiana.

57.     Gulf menhadens are small, oily marine filter feeding fish that use modifications of the bronchial apparatus (gill arches and gill rakers) to capture algae,

their primary source of food.  They play an extremely important role in the ecosystem of the Gulf of Mexico.

58.    Menhadens spend their short lives swimming in large schools filtering algae out of the water and converting it into their highly nutritious flesh.  This provides a crucial link between the primary producers of energy – plants – and the upper levels of the food chain, including sharks, dolphins, pelicans and a host of other sea life that rely on menhadens.  Unfortunately, this also makes them particularly vulnerable in the face of oil pollution in the Gulf.

59.    The menhaden is known to many recreational fishermen as bunker, pogie, or more simply, as bait.  Few things work as well as menhadens to catch fish.

60.    The menhaden fishery is the second largest fishery in the United States.  On average, more than 1 billion pounds of menhadens are caught commercially in the Gulf of Mexico each year.  The fishing season for menhadens lasts only from April to November.

61.    The menhaden fishery is highly industrialized.  It uses planes to spot the fish and large factory boats with vacuums to suck up the fish from large encircling nets deployed by smaller boats.  These fish are then converted into products such as fishmeal and fish oil for animal feed and other industrial uses.

**II.      The *Deepwater Horizon* Catastrophe**

62.    The *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi-submersible oil rig built in 2001.  It was owned by Transocean and leased to BP through September 2013.  It was one of the largest rigs of its kind.

63.     BP leased the *Deepwater Horizon* to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252, a location on the outer Continental Shelf off the coast of Louisiana.

64.     On April 20, 2010, the *Deepwater Horizon* was creating a cement seal and plug of the wellhead as part of the final phase of turning the Macondo well from an exploratory well into a production well.  "Cementing" is delicate work and carries a risk of a blowout, which is the uncontrolled release of oil and/or gas from the well.

65.     During the course of the cementing work, an explosion occurred on the *Deepwater Horizon* and it caught fire, causing the deaths and injuries of many workers on the rig.  The fire burned for two days, and the rig began to list progressively more until it finally sank on April 22, 2010.

66.     The *Deepwater Horizon* had been connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser.  As the *Deepwater Horizon* sank to the seafloor, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely.  The riser, bent into a crooked shape under water, now extended from the well to 1,500 feet above the sea bed and then buckled back down.  Oil was flowing out from the open end of the riser and from two places along its length.  As part of BP's containment efforts, the riser was cut just above the blowout preventer and oil now flows from essentially the top of the blowout preventer.

67.     Although the now-leaking wellhead is fitted with a blowout preventer – known as a BOP and consisting of a stack of hydraulically activated shears at the top of the well designed to pinch the pipe closed, cut it and seal off the well in the event of a sudden pressure release exactly like the one that occurred during the *Deepwater Horizon*

blowout – the response teams have been unable to activate the *Deepwater Horizon*'s BOP.

68.     The malfunctioning, faulty design, modifications, improper maintenance and/or improper use of the BOP are potential causes of the BOP's failure to cut off leakage of oil after the rig exploded and sank.

69.     If the BOP on the wellhead had been functional, it could have been manually or automatically activated following the explosions, cutting off the flow of oil at the wellhead, limiting the spill to a minute fraction of its current severity and thereby sparing plaintiffs millions of dollars in losses and damages.

70.     At the time of this filing, the wellhead has not been capped and the flow of oil continues unabated into the Gulf waters.  The ever-expanding oil slick made landfall on April 30, 2000, and will continue to affect greater areas of the Gulf coastline as it is driven landward by currents and winds.  While BP has begun drilling relief wells to stop the flow to the leaking well, it is estimated that that the relief wells will take until August 2010 to complete, while oil continues to flow out of the leaking well.

71.     The floating booms BP has set out to block the oil from reaching the coastline may be too low and/or placed too far out to sea to be useful because waves higher than three feet could lift the oil slick over the barriers.  At times in the few past weeks, the Gulf has experienced seven- to 10-foot swells, diminishing the usefulness of the booms. Additionally, the booms will not be effective in protecting the coastline from oil that sits below the water's surface and may wash up under the booms. The booms are designed as a measure against oil floating on the surface washing ashore and are therefore not effective against this oil spill as crude oil is suspended throughout the water column.

72.     As the oil continues to make landfall along the Gulf Coast, it will cause severe damage to the delicate wetlands and intertidal zones that line the coast of Louisiana, destroying the habitats where fish, including menhadens, breed, spawn and mature.

73.     Such devastation at the literal source of life for menhadens and other sea life will severely damage and perhaps even destroy the livelihoods of the plaintiffs, who rely on sea life for their livelihoods, for many years to come.

74.     On May 2, 2010, the National Oceanographic and Atmospheric Administration ("NOAA") restricted fishing for a minimum of 10 days in federal waters between Louisiana State waters at the mouth of the Mississippi River and the waters off Florida's Pensacola Bay, a total area of 6,800 square miles.

75.     Since then, the U.S. government has closed more than 78,000 square miles, or 32 percent, of federal waters in the Gulf of Mexico. As a result, plaintiffs are currently barred from or significantly restricted their seasonal fishery activities.

76.     Plaintiffs' livelihood has been and will be severely impacted or destroyed by this catastrophic spill.

**III.     Defendants' Knowledge Of The Risks**

77.     The risks of offshore drilling are well known to defendants, and are especially high in the Gulf of Mexico, where floating rigs are used, unlike the permanent rigs used in other areas such as the North Atlantic.  Permanent rigs that are anchored to the ocean floor cannot sink, while floating rigs are far more precarious and subject to disastrous results like this incident.

16

78.     Moreover, defendants knew the work the *Deepwater Horizon* was performing was especially risky.   In 2007, the MMS raised concerns about oil rig blowouts associated with the exact type of cementing work the *Deepwater Horizon* was doing when it exploded.   The MMS study noted that blowouts during cementing work were continuing with regularity, and most frequently in the Gulf of Mexico.   Cementing problems were associated with 18 of 39 blowouts between 1992 and 2006, and 18 of 70 from 1971 to 1991.   Nearly all the blowouts examined occurred in the Gulf of Mexico.

79.     Defendants were aware of the recent August 2009 blowout in the Timor Sea, which was found to have been caused by careless cementing work.   During that incident, which bears a strong resemblance to the *Deepwater Horizon* blowout, oil leaked from the site for 10 weeks, spreading damage over 200 miles from a well site.

80.     The threat of blowouts increases as drilling depth increases.   Under its permit, the *Deepwater Horizon* was supposed to be drilling in 5,000 feet of water, to a total depth of 18,000 feet below the seafloor.   Defendants were aware of the high risk of blowouts from such deep drilling.   As it turns out, defendants were drilling a few thousand feet below the maximum depth allowed under the permit.

81.     In addition to increasing the risk of blowouts, deep-sea drilling also increases the failure risk of the chief blowout safety mechanism, the BOP.   Defendants were aware of the risk of the BOP failing at greater depths, yet they did not install backup BOP activation systems, backup BOPs or other redundant precautionary measures.

82.     A 2004 study by federal regulators showed that BOPs may not function in deep-water drilling environments because of the increased force needed to pinch and cut the stronger pipes used in deep-water drilling.   Only three of 14 rigs studied in 2004 had

BOPs able to squeeze off and cut the pipe at the water pressures present at the equipment's maximum depth. "This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a blowout," the study said. Moreover, the study singled out Cameron, the manufacturer of the *Deepwater Horizon*'s BOP, for relying on faulty calculations to determine the needed strength for its BOP equipment to function properly at greater depths.

83.     The *Deepwater Horizon* was not equipped with a second, backup BOP, as newer rigs increasingly are. The *Deepwater Horizon* had only had one BOP installed, leaving the wellhead vulnerable to disaster if the single BOP fails, as it is believed to have done in this case.

84.     The *Deepwater Horizon* was also not equipped with a remote-control shut-off switch. The countries of Norway and Brazil require such shut-off switches, and many oil companies of comparable size to BP voluntarily use such shut-off switches even when not required. Such a device, costing $500,000, would have allowed the crew to trigger the BOP to shut down the well even if the oil rig itself is damaged or evacuated. On information and belief, BP pays $500,000 per day to Transocean for the lease of the *Deepwater Horizon*.

85.     Defendants' failure to take precautionary backup measures while drilling at depths they knew to be especially risky is made all the worse by the fact that defendants were drilling so close to the delicate and important natural resource of the Gulf Coastal marshes, wetlands and estuaries, a wellspring of marine life and the source of plaintiffs' livelihoods.

86.     Defendant BP has a history of cutting corners on safety to reduce operating costs.  In 2005, a blast at a Texas refinery killed 15 people and injured more than 170. Federal investigators found the explosions were in part due to cost-cutting and poor facility maintenance.  Also in 2005, a large production platform in the Gulf of Mexico began listing severely due to a defective control system.  And in 2006, four years after being warned to check its pipelines, BP had to shut down part of its Prudhoe Bay oilfield in Alaska after oil leaked from a corroded pipeline.

87.     Nevertheless, BP continues to fight for less regulation of the well exploration and production industry.  In 2009, defendant BP spent more than $16 million lobbying the federal government on issues including encouraging removing restrictions on drilling on the Continental Shelf, despite its history of spills and explosions and its knowledge of the high risks involved in such drilling.

88.     The fire and explosions on the *Deepwater Horizon*, its sinking and the resulting oil spill were caused by the negligence of defendants, which renders them jointly, severally and solidarily liable to plaintiffs for all their damages.

89.     Defendants knew the dangers associated with *Deepwater Horizon's* drilling and failed to take appropriate measures to prevent damage to plaintiffs and the marine, coastal and estuarine areas of Louisiana and the Gulf Coast where plaintiffs work and earn a living.  Moreover, additional safety mechanisms, technologies and precautions were known and available to defendants, but defendants chose not to employ them on the *Deepwater Horizon.*

90.     After the explosions, defendants attempted to downplay and conceal the severity of the oil spill.  Their initial leak estimates of 1,000 barrels per day and later

5,000 barrels per day were found by government investigators to be a fraction of the actual leakage amount of 35,000 to 60,000 barrels of oil per day.  Moreover, defendants did not, in the aftermath of the explosions or since that time, provide complete and/or timely announcements and warnings about the severity, forecast and trajectory of the oil spill.

91.    The oil spill and the resulting contamination have caused and will continue to cause loss of revenue to individuals and businesses that cannot use the Gulf of Mexico and Louisiana's shore to work and to earn a living.

92.    Because investigations are ongoing, there are many other potential effects from the oil spill that have not yet become known, and plaintiffs reserve the right to amend this Complaint after additional information becomes available.

**IV.    Damages**

93.    As a result of defendants acts or omissions, plaintiffs have suffered the following damages:

   a.    Loss of the right of use of the Gulf of Mexico and Louisiana saltwater areas because of the existence of the oil released by the sinking of the *Deepwater Horizon*;

   b.    loss of the right of use of the Gulf of Mexico and Louisiana saltwater areas because of the existence of booms in various areas which have been placed on the surface of the waters to block the oil released by the sinking of the *Deepwater Horizon*;

   c.    costs incurred and inconvenience sustained by the closure of Gulf water areas, harbors, marinas, boat launches, docks and waterways;

   d.    loss of the right to catch, keep and process for commercial purposes the menhadens and other sea life caught during fishing;

   e.    loss of the prorated amount of the saltwater permits issued by the State of Louisiana for fishing;

f.   loss associated with unusable costs of boats, planes, docks, insurance and other items purchased to engage in the fishing and dockworks; and

g.   costs and inconvenience of arranging for the storage of boats and other equipment moved from the areas affected by the oil spill.

## FIRST CLAIM FOR RELIEF

### Negligence

94.   Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

95.   Defendants owed a duty of reasonable care to plaintiffs in the operation and maintenance of the *Deepwater Horizon.*

96.   The blowout explosions, fires and resulting oil spill were caused by the joint and concurrent negligence and fault of the defendants.

97.   Defendants breached their duty of care owed to plaintiffs by:

a.   Failing to maintain and/or operate properly the *Deepwater Horizon*;

b.   manufacturing or operating the *Deepwater Horizon* in such a manner that an explosion and fire occurred onboard, causing it to sink and resulting in an oil spill;

c.   failing to use safe and proper materials for the manufacture or operation of the *Deepwater Horizon* and its related equipment, the well and its related casings, seals and cementing, the risers, the wellhead and the BOP and its related equipment;

d.   failing to inspect and test properly the *Deepwater Horizon* and its related equipment, the well and its related casings, seals and cementing, the risers, the wellhead and the BOP and its related equipment to assure that all equipment and personnel were fit for their intended purpose;

e.   acting in a careless and negligent manner;

f.    failing to promulgate, implement and enforce proper rules, procedures and regulations to ensure the safe manufacture, operations, testing and inspections of the *Deepwater Horizon* and its related equipment, the well and its related casings, seals and cementing, the risers, the wellhead and the BOP and its related equipment, which would have prevented the disaster;

g.    failing to take proper action to avoid or mitigate the incident;

h.    negligently implementing policies and procedures to conduct safely offshore operations in the Gulf of Mexico;

i.    failing to ensure that the *Deepwater Horizon* and its related equipment, the well and its related casings, seals and cementing, the risers, the wellhead and the BOP and its related equipment were free from defects and/or in proper working order;

j.    failing to properly train and hire appropriate and licensed personnel;

k.    employing untrained, poorly trained and unlicensed employees;

l.    failing to provide proper supervision of employees and operations;

m.    failing to observe and read gauges and other indicators that would have warned of excessive pressures in the well;

n.    failing to react in a timely manner to signs of danger;

o.    providing a BOP and related equipment that were not designed properly and/or did not operate properly;

p.    failing to provide backup equipment and systems capable of securing the well and preventing releases of oil in the absence of a properly functioning BOP;

q.    conducting well and well cap cementing operations improperly;

r.    failing to warn in a timely manner;

s.    failing to bring the oil release under control in a timely manner;

t.    failing to provide and maintain appropriate disaster prevention equipment;

u.    acting in a manner that justifies imposition of punitive damages; and

v.    such other acts and omissions as will be shown at the trial of this matter which are in violation of the laws of the State of Louisiana and federal law applicable to the outer Continental Shelf.

98.    In addition, the disaster and resulting damage to plaintiffs were caused by defective, malfunctioning and improperly designed or improperly used equipment and materials, including but not limited to the *Deepwater Horizon* and its related equipment, the well and its related casings, seals and cementing, the risers, the wellhead and the BOP and its related equipment, which were in the care, custody and control of the defendants and over which they had *garde*. Defendants knew or should have known of these defects and defendants are, therefore, liable for them.

99.    The injuries to plaintiffs were also caused by or aggravated by the fact that defendants failed to take necessary actions to mitigate the dangers associated with their manufacturing or operations.

100.    Furthermore, the disaster would not have occurred had the defendants exercised a high degree of care. Plaintiffs, therefore, plead the doctrine of *res ipsa loquitur*.

101.    Plaintiffs are entitled to judgment finding defendants liable to plaintiffs for damages suffered as a result of defendants' acts and omissions.

## SECOND CLAIM FOR RELIEF

### Gross Negligence

102.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

103.    Defendants owed a duty to plaintiffs to exercise reasonable care in the manufacture, maintenance, operation, testing and inspection of the *Deepwater Horizon* and its related equipment, the well and its related casings, seals and cementing, the risers, the wellhead and the BOP and its related equipment.

104.    Defendants had a heightened duty of care to all plaintiffs because of the great danger associated with deep drilling from floating platforms, and the especially high risk of blowouts during cementing work such as that *Deepwater Horizon* was performing at the time of the explosions.

105.    Defendants breached their legal duty to plaintiffs, failed to exercise reasonable care and acted with reckless, willful and wanton disregard for the business and livelihood of others, including plaintiffs, in the negligent manufacture, maintenance and/or operation of the *Deepwater Horizon* and its related equipment, the well and its related casings, seals and cementing, the risers, the wellhead and the BOP and is related equipment.

106.    Defendants knew or should have known that their wanton or reckless conduct would result in a disastrous blowout, causing an oil spill and damage to the economic interests of individuals and businesses in the area affected by the oil spill.

107.   As a direct and proximate result of defendants' wanton or reckless conduct, plaintiffs have suffered injury in damages in an amount to be proven at trial, including, but not limited to, loss of livelihood, loss of income and other economic loss.

108.   Defendants' wanton or reckless conduct, as described above, entitles plaintiffs to punitive damages.

### THIRD CLAIM FOR RELIEF

#### Negligence *Per Se*

109.   Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

110.   Defendants' conduct with regard to the manufacture, maintenance and/or operation of drilling operations and oil rigs such as the *Deepwater Horizon* is governed by numerous state and federal laws and regulations, and permits issued under the authority of these laws.

111.   These laws and permits create statutory standards that are intended to protect and benefit plaintiffs.  For example, under its permit, the *Deepwater Horizon* was supposed to be drilling in 5,000 feet of water, to a total depth of 18,000 feet below the seafloor.  Instead, defendants were drilling a few thousand feet below the maximum depth allowed under the permit.

112.   Defendants' violations of the statutory standards constitute negligence *per se* under Louisiana law.

113.   Defendants' violations of these statutory standards proximately caused plaintiffs injuries, warranting compensatory and punitive damages.

## TRIAL BY JURY DEMANDED

Plaintiffs are entitled to trial by jury as to all claims for relief alleged in this Amended Complaint as to all defendants and therefore demand trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment against the defendants jointly, severally and solidarily, as follows:

1. Economic and compensatory damages in amounts to be determined at trial;

2. punitive damages;

3. pre-judgment and post-judgment interest at the maximum rate allowable by law;

4. attorneys' fees and costs of litigation;

5. any other and further relief available under all applicable state and federal laws;

6. any other and further relief the Court deems just and proper; and

7. a trial by jury as to all defendants.

Dated: June 16, 2010

/s/   Jeffrey A. Breit
Jeffrey A. Breit
Breit Drescher & Imprevento
999 Waterside Drive
Norfolk , Virginia 23510
Tel.: 757-670-3888
Fax: 757-670-3895
E-mail: jbreit@bdbmail.com
Web Site: www.breitdrescher.com

Louisiana Bar # 03451

Robert J. Gordon
Robin L. Greenwald
Curt D. Marshall
Weitz & Luxenberg, P.C.
700 Broadway
New York, New York 10003
Tel.:  (212) 558-5500
Fax:  (212) 344-5461
Email: rgrodon@weitzlux.com
Email:  rgreenwald@weitzlux.com
Email:  cmarshall@weitzlux.com

***Attorneys for Plaintiffs***